## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **DIANE L. GHOLSTON,** | ) | |
| | ) | **No. 11 CV 4671** |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Magistrate Judge Young B. Kim** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security** | ) | |
| **Administration,** | ) | |
| | ) | **April 27, 2012** |
| **Defendant.** | ) | |

### MEMORANDUM OPINION and ORDER

Plaintiff Diane Gholston seeks review of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. § 423(d)(2), and Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1382c(a)(3)(A). Before the court are the parties' cross-motions for summary judgment. Gholston asks the court to reverse the Commissioner's decision and award benefits, or in the alternative, to remand the case for further proceedings. The Commissioner seeks an order affirming the decision. For the following reasons, Gholston's motion for summary judgment is granted insofar as it requests a remand and the Commissioner's motion is denied:

### I. Procedural History

Gholston applied for DIB and SSI in 2008, alleging that she became disabled on November 1, 2002, due to arthritis, breast cancer, and high blood pressure. (Administrative

Record ("A.R.") 70, 179-80, 181-86.)  The Commissioner denied her applications in June

2008, (id. at 66-70, 71-75), and again on reconsideration in November 2008, (id. at 78-81,

82-85).  Thereafter, Gholston requested and received a hearing before an administrative law

judge ("ALJ").  (Id. at 86.)  On June 25, 2010, the ALJ issued a decision finding Gholston

not disabled.  (Id. at 20-26.)  The Appeals Council denied Gholston's request for review on

May 11, 2011, (id. at 1-3), making the ALJ's decision the final decision of the

Commissioner, *see Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008).  Pursuant to 42

U.S.C. § 405(g), Gholston initiated this civil action for judicial review of the Commissioner's

final decision.  The parties have consented to the jurisdiction of this court pursuant to 28

U.S.C. § 636(c).

## II.  Background

### A.    Summary of Medical Evidence

Gholston, who is 61 years old, suffers from neck, back, knee, and ankle pain,

osteoarthritis of the knees and ankles, migraine headaches, high blood pressure, and obesity.

She also has a history of breast cancer.  Beginning in January 2001, Gholston underwent an

orthopedic evaluation with Dr. Charles Lettvin.  (A.R. 478.)  Gholston complained to

Dr. Lettvin that her knees hurt when she walked up and down stairs and reported that she felt

like there was something "out of joint" in her knees when she walked.  (Id.)  Dr. Lettvin first

noted that Gholston was very obese and that she walked with a mild limp.  (Id.)  On

examination, Dr. Lettvin found that Gholston had diffuse tenderness around the kneecaps of

both her knees.  (Id.)  X-rays  of her knees showed mild degeneration on both sides.  (Id. at

474, 478.)  Dr. Lettvin diagnosed that Gholston suffers from bilateral patellofemoral

degeneration and chondromalacia patella symptoms of the knees.[1]  (Id. at 478.)  He

prescribed ice packs, prescription strength anti-inflammatory medication, and strengthening

exercises.  (Id. at 479.)  Dr. Lettvin also advised Gholston that if she did not improve, she

might require physical therapy and a cortisone injection.  (Id.)  Because she continued to have

pain in her knees, Gholston underwent a course of physical therapy beginning in April 2001.

(Id. at 480.)

In October 2001, Gholston sought emergency medical treatment for back, neck, and

migraine headache pain.  (Id. at 472, 482.)  She described pounding headache pain that had

been getting worse throughout the week and numbness in her hands.  (Id. at 482.)  A CT scan

of the head showed no abnormalities.  (Id. at 473.)  But an x-ray of the cervical spine

indicated mild straightening of the usual cervical lordosis, mild spurring of the end plates at

the C4-C5 and C5-C6 levels, and mild osteophytic encroachment of the intervertebral

foramina at these same levels.  (Id. at 472.)  Hospital notes indicate that Gholston was taking

a number of medications to treat her migraine headaches, high blood pressure, and arthritis.

(Id. at 482.)  A month later, in November 2001, Gholston reported improvement in her neck

---

[1]  Chondromalacia patella is the abnormal softening of the cartilage under the kneecap.
Chondromalacia patella results from the degeneration of cartilage due to poor alignment of
the kneecap as it slides over the lower end of the thigh bone (femur).  This condition is often
referred to as patellofemoral syndrome.  *See* http://www.medicinenet.com/patello-femoral_
syndrome/article.htm (last visited April 27, 2012).

pain, but in March 2002, she again sought treatment for migraine headaches and was prescribed Imitrex. (Id. at 447.)

Two years later, in February 2004, Gholston sought emergency care because she was having difficulty walking due to knee pain and swelling. (Id. at 329-30.) She was diagnosed with degenerative joint disease in both of her knees and chronic leg pain. (Id. at 331.) The following year, in March 2005, Gholston again sought emergency medical treatment for knee pain after she fell on a concrete surface and hit her knees. (Id. at 497-98.) An x-ray evaluation of her knees showed mild degenerative joint disease, but there was no evidence of an acute fracture or dislocation. (Id. at 499.) Gholston returned to the emergency room 10 days later complaining of lower leg pain and swelling. (Id. at 500-01.) A sonograph showed no evidence of deep venous thrombosis in the lower extremities. (Id. at 502.) Hospital notes indicate that Gholston was able to walk without assistance and that she had a steady gait. (Id. at 501.) At that time, Gholston was also treated for a migraine headache and prescribed Vicodin. (Id.)

In December 2005, Gholston was diagnosed with left-side breast cancer. (Id. at 313-17.) She underwent a lumpectomy[2] and four months of radiation treatment. (Id. at 347, 507.) Gholston was also prescribed a two-year course of Tamoxifen, a medication used to treat breast cancer. (Id. at 22, 310.) In November 2007, she had a recurrence of breast cancer, (id.

---

[2]  A lumpectomy is the removal of the breast tumor and some of the normal tissue that surrounds it.  See http://www.breastcancer.org/treatment/surgery/lumpectomy/what_is.jsp (last visited April 27, 2012).

at 307-08), and, as a result, a left-side mastectomy was performed on her in February 2008, (id. at 304-05, 372-73). During this surgery, Gholston also underwent placement of a left-side tissue expander in anticipation of reconstructive surgery. (Id. at 370.)

In June 2008, Dr. Richard Bilinsky, a state agency physician, reviewed Gholston's medical file and completed a Physical Residual Functional Capacity Assessment form. (Id. at 383-90.) Dr. Bilinsky opined that Gholston can occasionally lift and carry 20 pounds, frequently lift and carry 10 pounds, stand and walk for about six hours in an eight-hour workday, sit for about six hours in an eight-hour workday, and occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. (Id. at 384-85.) He further determined that Gholston has a limited ability to reach in all directions and that she must avoid concentrated exposure to hazards, including machinery and heights. (Id. at 386-87.) Dr. Bilinsky noted that Gholston's reported daily activities are fairly limited because of her surgery, obesity, and painful knees and feet. (Id. at 388.) And he noted that Gholston uses a cane when her arthritis flares up, but that she does not use it all the time. (Id.) Dr. Bilinsky listed Gholston's height as 5' 3" and her weight as 247 pounds. (Id. at 390.) He noted that there were "no credibility issues" because the medical record substantiated Gholston's reported daily activities. (Id. at 388.) A state agency medical consultant concurred with Dr. Bilinsky's findings. (Id. at 435-37.)

In January 2009, Gholston underwent a second surgery, which consisted of a right mammoplasty with reduction and removal of the left-side tissue expander that had caused an

infection. (Id. at 526, 529, 573.) In December 2009, Gholston reported that her headaches had improved, but that she was having knee and ankle pain, and occasional back pain. (Id. at 613.) Her ankle x-rays showed only minimal degenerative changes and knee x-rays indicated degenerative changes, which were somewhat more prominent on the left. (Id. at 611, 612.) Next, in February 2010, Gholston complained of waking up with painful headaches where the pain began on the left side of her head and moved to her neck. (Id. at 606.) Gholston underwent a CT scan of the head, which produced results that were described as unremarkable. (Id. at 604.) The treating physician diagnosed Gholston as likely having migraine headaches and prescribed medication. (Id. at 607-08.)

In April 2010, Gholston was evaluated for complaints of bilateral knee and ankle pain. (Id. at 603.) At that time, Gholston reported that she had experienced ankle and knee pain for 10 years. (Id.) She described her pain as being worse when she stood for more than 20 minutes and it was also worse on ambulation. (Id.) Gholston explained that she had fallen off balance twice and that she sometimes uses a cane. (Id.) An examination of the lower extremities indicated medial joint tenderness of the knees, with the left worse than the right, and ankle tenderness. (Id.) Treatment notes indicate that Gholston weighed 232 pounds and a recommendation was made that she lose weight. (Id.) The treating physician diagnosed Gholston with osteoarthritis of the knees. (Id.)

B.    **Gholston's Testimony**

At the hearing before the ALJ, Gholston described the multiple physical limitations that interfere with her ability to work.  She first explained that she has pain throughout her body, but mostly in her knees and feet.  (A.R. 40, 45-46.)  Gholston experiences pain in her ankles, toes, heels, and the bottoms of her feet.  (Id. at 46.)  She explained that if she stands for 15 to 20 minutes her feet begin to tingle because they become numb and then she must sit down.  (Id. at 40, 46.)  She described having pain in her neck when she wakes up in the morning that persists throughout the day.  (Id. at 46-47.)  Gholston also has lower back pain about twice a week, but she does not take any medication for her neck and back pain.  (Id. at 47.)  She stated that she has been using a cane since 2002 but she now uses it as much as she can because of a recent fall.  (Id. at 39-40.)

Gholston next testified that her headaches also interfere with her ability to work.  She described having headaches as frequently as twice a month, with one headache always being particularly severe.  (Id. at 43-45.)  Gholston explained that a severe headache lasts from one to two weeks so typically she has a headache for about half the month.  (Id. at 43-44.)  When she begins to get a headache, she takes Imitrex and lies down.  (Id. at 41, 44.)  She is only permitted to take two Imitrex pills per day because she is prescribed a set number of pills, but her headaches are such that she must always take the second pill.  (Id. at 41-42.)  The medication eases her headache, but does not resolve it.  (Id. at 42.)  She experiences blurry vision and sensitivity to noise and she cannot wear her glasses or watch television while she

has a severe headache. (Id. at 42, 44.) Gholston explained that when her headaches began 26 years earlier, she took prescription strength Tylenol (with codeine) and spent days in bed in the dark with no television or noise, but they are somewhat less severe now when she takes Imitrex. (Id. at 45.)

Gholston testified that on a typical day she wakes up between 8:00 a.m. and 9:00 a.m., grabs her cane, and goes into the bathroom to brush her teeth. (Id. at 47-48.) She then calls her niece to come to her apartment to help her take a shower, get dressed, and make breakfast. (Id. at 48-49.) After breakfast, Gholston will sit and elevate her feet for about an hour so that her ankles do not swell. (Id. at 49.) After sitting for an hour, she will stand up and then sit down again. (Id.) Gholston explained that her niece or cousin will take her to the grocery store once a month. (Id. at 49, 55-56.) She stated that she must rely on her niece or cousin to push the grocery cart, place food items in the cart, and stand in line to pay the cashier. (Id. at 55-56.) Her cousin also does her laundry once a month because Gholston's arms and fingers hurt when she lifts wet laundry. (Id. at 50-51.) She explained that she has had finger pain that lasts about four hours each day since 2003. (Id. at 51.) Gholston cannot lift heavy objects because of left arm soreness and she estimates that she can lift about a half gallon of milk. (Id. at 55.) She is unable to drive because her leg and knee get stiff and bother her. (Id. at 56.) Gholston sometimes reads, watches television, and visits with family. (Id. at 53-54.)

### C.    Vocational Expert's Testimony

A vocational expert, William Newman, testified that Gholston's past relevant work as a tax preparer, telemarketer/customer service representative, and school secretary constitute semi-skilled and sedentary level work. (A.R. 57.) He described Gholston's past work as a teacher's aide as constituting semi-skilled and light-level work, but he explained that she performed that job at the sedentary level. (Id.) The ALJ next asked Newman what effect an individual's inability to stand for more than 15 to 20 minutes at a time would have on these jobs. (Id. at 58.) He responded that the standing limitation would only impact the teacher's aide position because it is typically performed at the light level. (Id.) Newman also explained that if an individual needed to use a cane to walk she may not be able to perform the teacher's aide position or the tax preparer position, because these positions may require an individual to carry materials and push carts. (Id.) He testified, however, that the hypothetical individual could perform the telemarketer/customer service representative and school secretary positions. (Id.)

Newman next explained that these jobs would allow for unscheduled rest breaks at least once an hour but would accommodate no more than 1.5 days of absenteeism per month. (Id. at 58-60.) He also testified that if an individual needed to lie down during the workday or remove herself from the workplace for a total of two hours during the workday, that would eliminate the jobs he identified. (Id. at 60.)

**D.      The ALJ's Decision**

The ALJ evaluated Gholston's claim under the required five-step analysis. *See* 20 C.F.R. §§ 404.1520, 416.920. She concluded that: (1) Gholston had not engaged in substantial gainful activity since November 1, 2002, the alleged onset date of her disability; (2) her history of breast cancer, arthritis of the knees, migraine headaches, and hypertension constitute severe impairments; (3) these impairments do not individually or collectively meet or equal a listed impairment; (4) Gholston has the residual functional capacity ("RFC") to perform the full range of sedentary work; and (5) based on this RFC she can perform her previous work as a tax preparer, telemarketer/customer service representative, and school secretary. (A.R. 22-26.)

In reaching this decision, the ALJ noted that there is no treating source opinion that Gholston is disabled and unable to work due to her impairments. (Id. at 25.) The ALJ acknowledged that there is record support for Dr. Bilinsky's finding that Gholston can perform light work, but determined that due to the arthritis in her knees and her obesity, she cannot stand or walk more than occasionally, and thus she is limited to no more than sedentary-level work. (Id.) Regarding the severity of Gholston's headaches, the ALJ noted that she testified that her headaches have improved with prescription medication and that she was able to work for many years despite having migraine headaches without taking any medication. (Id.) The ALJ found Gholston's testimony that she has needed to use a cane all the time since 2002 incredible because it lacked support in the record. (Id.) The ALJ

10

explained that the treatment notes do not indicate that Gholston needed or used a cane and that the only mention of her cane use is in an April 2010 note that she "sometimes" uses a cane. (Id.) The ALJ also disbelieved Gholston's testimony regarding her hand pain because it was not verified by treatment notes and because in December 2009 she denied having any small joint pain. (Id.) For these reasons, the ALJ concluded that the medical evidence failed to corroborate Gholston's claimed limitations, and that an RFC for sedentary work accommodated the limitations that are supported by the objective medical findings, treatment history, and Gholston's description of her daily activities.

## II. Analysis

Gholston challenges several aspects of the ALJ's decision in her motion for summary judgment. She first argues that the ALJ failed to evaluate her obesity at step three of the sequential evaluation as required by Social Security Ruling ("SSR") 02-1p. Gholston next asserts that the ALJ failed to properly assess her credibility. She further claims that the ALJ erred in crafting the RFC because she did not consider her migraine headaches, her need to elevate her legs due to ankle swelling, her inability to stand for more than 15 to 20 minutes at a time, and her sitting limitations. Lastly, Gholston avers that the ALJ failed to consider whether she was entitled to a closed period of disability from the time she was first diagnosed with breast cancer in 2005 through the time her cancer recurred in 2007.

This court must confine its review of the Commissioner's decision to the reasons offered by the ALJ, *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (citing *SEC v.*

*Chenery Corp.*, 318 U.S. 80, 93-95 (1943)), and determine whether the ALJ's decision is supported by substantial evidence, *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). This court may not reevaluate the facts, reweigh the evidence, or substitute its judgment for that of the Social Security Administration. *Binion on Behalf of Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). However, where the Commissioner commits an error of law, and the error is not harmless, the court must reverse the decision regardless of the evidence supporting the factual findings. *Id.*

## A. Step-Three

Gholston contends that the ALJ failed to properly evaluate her obesity at step three of the sequential evaluation as required by SSR 02-1p. (R. 15, Pl.'s Mem. at 5-6.) She complains that the ALJ neglected to consider her extreme obesity and its effect on her impairments. (Id. at 6.) Thus, according to Gholston, the ALJ failed to address whether the severity of her obesity rises to such a level as to meet or medically equal a listed impairment. (Id.) The Commissioner counters that the ALJ did not commit reversible error because the Seventh Circuit does not require the ALJ to provide a "high degree of articulation" or to reference a specific listing at step three. (R. 20, Def.'s Mem. at 5.) The Commissioner also contends that an ALJ does not need to explicitly mention a claimant's obesity where it is

evident from the decision that she considered it indirectly.  (Id.)  The Commissioner contends that the ALJ's explicit references to Gholston's weight at several points in her decision shows that she properly considered the impact of her obesity.  (Id.)

The court agrees with Gholston that the ALJ overlooked key evidence at step three and failed to properly assess whether her impairments met or medically equaled a listed impairment.   Pursuant to SSR 02-1p, obesity should be considered at step three when assessing whether an individual's "impairment(s) meets or equals the requirements of a listed impairment."  SSR 02-1p, 2000 WL 628049, at *3.  An ALJ should "find that a listing is met if there is an impairment that, in combination with obesity, meets the requirements of a listing."  Id. at *5.  For instance, "obesity may increase the severity of coexisting or related impairments to the extent that the combination of impairments meets the requirements of a listing."  Id.  Furthermore, obesity may, by itself, or in combination with other impairments, establish the equivalent of a listing if the impairment is "equivalent in severity to a listed impairment."  Id.   Therefore, an ALJ may find that a claimant's obesity is medically equivalent to a listed impairment "if the obesity is of such a level that it results in inability to ambulate effectively."  Id.

In concluding that her impairments did not meet or equal a listed impairment, the ALJ failed to explain why Gholston's impairments do not meet Listing 1.02 and Listing 1.04 or why Gholston's obesity in combination with her joint pain would not support a conclusion that she meets the requirements for these listings.  The ALJ's analysis at step three consists

13

of a conclusory statement: "Consideration is given under listings 1.02 (Major dysfunction of a joint due to any cause) and 1.04 (Disorders of the spine) but the objective findings fail to document the degree of limitation and dysfunction required to satisfy listing level severity."[3] (A.R. 24.) The ALJ did not explain why the medical evidence of Gholston's extreme obesity—including, records documenting her degenerative joint disease of the knees, her emergency room visits for difficulty walking due to knee pain and swelling, and Dr. Bilinsky's statement that Gholston's activities were fairly limited due to her obesity and painful knees and feet—do not support a finding that Gholston's impairments individually, or in combination, meet or medically equal a listed impairment.[4] (Id. at 330, 331, 388, 390, 423, 474, 478, 499, 603.) Although an ALJ is not required to discuss every piece of evidence, she must consider all of the evidence that is relevant to the disability determination and provide enough analysis in her decision to permit meaningful judicial review. *Clifford v. Apfel*, 227 F.3d 863, 870-71 (7th Cir. 2000). In other words, the ALJ must build an "accurate and logical bridge from the evidence to" her conclusion. *Scott v. Barnhart*, 297

---

[3] The ALJ's step three analysis also includes a second conclusory statement: "With regard [to] the claimant's history of left breast cancer there is no evidence of locally advanced carcinoma, distant metastasis or recurrent carcinoma as delineated in listing 13.10." (A.R. 24.) But Gholston does not contend that the ALJ's step-three analysis regarding this second statement violates the requirements of SSR 02-1p.

[4] The record reflects that Gholston is 5' 3" tall and weighs 240 pounds. (A.R. 390, 423.) According to the National Heart Lung and Blood Institute, National Institutes of Health, Gholston has a body mass index ("BMI") equal to 42.5. *See* http://www.nhlbisupport.com/bmi/ (last visited on April 27, 2012). A BMI greater than or equal to 40 is considered Level III or extreme obesity. SSR 02-1p, 2000 WL 628049, at *2.

F.3d 589, 595 (7th Cir. 2002) (citation omitted). Thus, the ALJ's conclusory statement that "the objective findings fail to document the degree of limitation and dysfunction required to satisfy listing level severity" is not sufficient.

Furthermore, the ALJ's failure to properly articulate her step-three finding is particularly problematic as it relates to Listing 1.02. SSR 02-1p makes clear that if obesity results in an inability to ambulate effectively, as defined in section 1.00B2b of the listings, it may substitute "for the major dysfunction of a joint(s) due to any cause (and its associated criteria), with the involvement of one major peripheral weight-bearing joint in listing[] 1.02A." SSR 02-1p, 2000 WL 628049, at *5. So, if obesity qualifies as a substitute under section 1.00B2b, a finding of medical equivalency is appropriate. Here, the ALJ did not address whether Gholston's obesity resulted in an inability to ambulate effectively. Because there is evidence that could support a conclusion that Gholston cannot ambulate effectively and thus whether Gholston's limitations satisfy the criteria set forth in 1.00B2b, the ALJ erred by failing to consider whether Gholston's extreme obesity in combination with her knee impairments would support a finding that she met or equaled Listing 1.02.

The ALJ's conclusion that Gholston's back disorder does not meet a listed impairment also lacks the requisite analysis. Listing 1.04 defines disorders of the spine to include spinal stenosis and degenerative disc disease, with neuroanatomic distribution of pain, limitation of spinal motion, and positive straight-leg raising test. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04. Again, the ALJ does not explain why she rejected the record evidence, which

15

consisted of an x-ray of Gholston's cervical spine that indicated mild straightening of the usual cervical lordosis, mild spurring of the end plates at the C4-C5 and C5-C6 levels, and mild osteophytic encroachment of the intervertebral foramina at these same levels. (A.R. 472.) Furthermore, Gholston described having pain in her neck when she wakes up in the morning that persists throughout the day and lower back pain that flares about twice a week. (Id. at 46-47.) The ALJ never addressed this evidence or explained why she found that Gholston's impairments do not meet Listing 1.04.

While the Commissioner claims that the ALJ adequately addressed Gholston's obesity because she mentioned it three times in the fact section of her decision, these notations do not provide this court with the ALJ's reasoning or any assurance that she considered Gholston's obesity as required by SSR 02-1p. Furthermore, the cases cited by the Commissioner are inapposite because in those cases the ALJs provided detailed explanations for why the applicable listings were not met. *See e.g., Jolivette v. Astrue*, 332 Fed.Appx. 326, 327 (7th Cir. 2009) ("It is not necessary to cite a regulation by number; the agency's obligation is to apply the law to the facts, and this ALJ did so by covering each ingredient of Listing 1.04A"); *Rice v. Barnhart*, 384 F.3d 363, 369-70 (7th Cir. 2004) ("As to [plaintiff's] argument that the ALJ's failure to explicitly refer to the relevant listing alone necessitates reversal and remand, we have not yet so held and decline to do so here"). Here, by contrast, the ALJ referenced the applicable listings but provided not a shred of articulation

16

to explain her conclusion that the objective medical evidence does not support a finding that Gholston's impairments do not rise to a listing level when considered with her obesity.

The Commissioner further argues that the Seventh Circuit does not require an ALJ to explicitly discuss a claimant's obesity when she has considered it indirectly. In asserting his position, the Commissioner relies on a number of cases where the Seventh Circuit found that although the ALJ did not explicitly address a claimant's obesity, the ALJ implicitly factored the claimant's obesity into the RFC determination by adopting the limitations suggested by the physicians who were aware of the impairment. *See e.g., Outlaw v. Astrue*, 412 Fed.Appx. 894, 898 (7th Cir. 2011); *Richards v. Astrue*, 370 Fed.Appx. 727, 733 (7th Cir. 2010); *Prochaska v. Barnhart*, 454 F.3d 731, 736-37 (7th Cir. 2006); *Skarbek v. Barnhart,* 390 F.3d 500, 504 (7th Cir. 2004). But all of those cases deal with the ALJ's RFC evaluation of a claimant's obesity at step four rather than step three of the sequential evaluation and there is nothing to suggest that the Seventh Circuit intended to overlook an ALJ's decision to shirk the step-three analysis as long as the ALJ provides sufficient details at step four. SSR 02-1p, 2000 WL 628049, at *3 (an ALJ is required to evaluated a claimant's obesity at each step of the sequential evaluation).

Accordingly, this court remands this action to the ALJ to review the evidence and address the issue of whether Gholston's impairments, including her obesity, meet or equal a listed impairment. *See Brindisi ex. rel. Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003) (finding that the "omission of any discussion of [plaintiff's] impairments in

17

conjunction with the listings frustrates any attempt at judicial review"); *Scott*, 297 F.3d at 596 (remanding when the ALJ failed to minimally articulate the basis for finding plaintiff did not meet the listing); *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009) (holding that under SSR 02-1p the ALJ must address the effect of obesity on a claimant's limitations because, for example, a person who is obese and arthritic may experience greater limitations than a person who is only arthritic); *Accurso v. Astrue*, No. 10 C 968, 2011 WL 578849, at *4 (N.D. Ill. Feb. 9, 2011) (remanding so that ALJ could properly consider whether the claimant's impairments, including his obesity, meet or equaled a listed impairment).

**B.     Credibility**

Gholston argues that the ALJ failed to properly analyze her credibility as required by SSR 96-7p. (R. 15, Pl.'s Mem. at 6-9.) She first claims that the ALJ erred by using the credibility boilerplate criticized by the Seventh Circuit and by improperly assessing the credibility of her testimony after she developed the RFC finding. (Id. at 7-8.) Gholston next argues that the ALJ never explained which portions of her testimony regarding her pain she found incredible or inconsistent with the medical evidence. (Id. at 8.) She further asserts that the ALJ mischaracterized her testimony regarding her use of a cane and also her testimony regarding her migraine headache medication. (R. 21, Pl.'s Reply at 5.) In response, the Commissioner asserts that the ALJ's use of the credibility boilerplate was not improper because she appropriately explained why she found Gholston's allegations of disabling limitations not credible. (R. 20, Def.'s Mem. at 5-6.) According to the

18

Commissioner, the ALJ properly considered the objective medical evidence, the state agency physicians' opinions, and Gholston's activities, medications, treatment history, and allegations of disabling limitations in assessing Gholston's credibility. (Id. at 6.)

This court finds that the ALJ failed to properly assess the credibility of Gholston's hearing testimony. An ALJ's credibility finding will be afforded "considerable deference" and will be overturned only if it is "patently wrong." *Prochaska*, 454 F.3d at 738 (citations omitted). "A credibility assessment is afforded special deference because the ALJ is in the best position to see and hear the witness and determine credibility." *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000) (citation omitted). However, where the credibility determination is based on objective factors rather than subjective considerations, an ALJ is in no better position than the court and so the court has greater freedom to review it. *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008). In either case, the ALJ must provide an explanation for her credibility assessment that is sufficient to give the reviewing court a fair sense of how she weighed the claimant's testimony. *Zurawski v. Halter,* 245 F.3d 881, 887 (7th Cir. 2001).

SSR 96-7p establishes a two-step process for evaluating symptoms, such as pain. SSR 96-7p, 1996 WL 374186, at *2. First, the ALJ must consider whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce a claimant's pain or other symptoms. *Id.* Second, if there is such underlying physical or mental impairment, the ALJ must evaluate the intensity, persistence, and limiting

19

effects of a claimant's symptoms to determine the extent to which the symptoms limit a claimant's ability to perform basic work activities. *Id.* If a claimant's statements about the intensity, persistence, or functional limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of a claimant's statements based on her consideration of the entire case record. *Id.*

An ALJ cannot discredit a claimant's testimony about her pain and limitations "solely because there is no objective medical evidence supporting it." *Villano*, 556 F.3d at 562 (citations omitted). In other words, an ALJ is not permitted to "disbelieve [a claimant's] testimony solely because it seems in excess of the 'objective' medical testimony." *Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006) (citation omitted). SSR 96-7p specifically requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) (citation omitted).

Here, the ALJ's credibility determination is legally insufficient because she did not explain with the requisite detail her rationale for finding Gholston's testimony not credible. While the ALJ provided a detailed accounting of Gholston's testimony in the background section of her decision, she did not properly articulate in the analysis section why she found her testimony inconsistent with the record evidence. Furthermore, the few reasons the ALJ

20

gave for finding Gholston's testimony not believable are not supported by substantial evidence.

The ALJ first discredited Gholston's testimony regarding the severity of her headaches because she found that her headaches had improved with prescription medication and that she had been able to work for many years without taking medication despite having headaches. (A.R. 25.) The ALJ mischaracterized Gholston's testimony. She never testified that she worked without taking medication. (Id. at 45.) On the contrary, Gholston testified that she took prescription strength Tylenol (with codeine) when her migraine headaches began many years ago. (Id.) And although it is true that Gholston testified that more recently Imitrex has eased her headaches, that admitted improvement does not necessarily equate with the ability to work on a full-time basis. *See e.g., Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011) ("There can be a great distance between a patient who responds to treatment and one who is able to enter the workforce."). For example, Gholston testified that she had headaches about twice a month, with one headache always being particularly severe. (Id. at 43-45.) She explained that a severe headache lasts from one to two weeks so typically she has a headache for about half the month. (Id. at 43-44.) Her severe headaches are accompanied by blurry vision and sensitivity to noise, and she must lie down until those symptoms resolve. (Id. at 42, 44.) But here the ALJ committed reversible error because she did not analyze whether she found those limitations believable, or explain how they square with her conclusion that she had improved to a point of being able to perform full-time work.

21

The ALJ also found Gholston's testimony that she needed to use a "cane all the time since 2002" incredible because it lacked support in the record. (Id. at 25.) Here, the ALJ pointed out that the only treatment note mentioning her cane use indicates that she "sometimes" used a cane. (Id.) But Gholston never said that she has used a cane "all the time" since 2002. Instead, she testified that although she has used a cane since 2002, she now uses it as much as possible due to a recent fall. (Id. at 39-40.) Gholston testified as follows regarding her cane use when questioned by the ALJ:

> Q.: How long have you been using a cane?
> A.: Since 2002.
> Q.: How often do you use it?
> A.: As much as I can because I've fallen more recently this past year when I tried to walk without it.
> Q.: So do you use it just when you're outside or do you use it in your home too?
> A.: I use it in my home because I also fell in my apartment.
> Q.: Okay. How long has it been that you've been using it inside your house too?
> A.: Since 2002.

(Id.) Thus, the ALJ's criticism that she exaggerated by saying she uses a cane "all the time" is again based on a mischaracterization of her testimony.

The ALJ next erred in her credibility determination because she failed to explain why the medical evidence does not support Gholston's other claims of disabling pain and limitations. At the hearing, Gholston testified that she has pain throughout her body, but mostly in her ankles, toes, heels, the bottoms of her feet, and neck. (Id. at 40, 45-46.) She described the limitations that result from these impairments, which include, for example, her

22

instability walking which causes her to use a cane, her inability to stand for more than 15 to 20 minutes at a time, her need to elevate her legs because of ankle swelling, and her need for assistance from family members with daily activities. (Id. at 39-40, 48-49, 50-51, 55-56.) There is ample medical evidence in the record to support Gholston's history of knee, ankle, neck, and back pain. (Id. at 330, 331, 423, 447, 472, 474, 478, 482, 499, 501, 603, 611, 612, 613.) But the ALJ never explained why she found Gholston's complaints of pain inconsistent with the medical evidence. That amounts to reversible error. *See e.g., Zurawski*, 245 F.3d at 887-88 (ALJ should have explained why claimant's testimony and complaints of pain were inconsistent with the medical evidence).

But even if Gholston's allegations of pain and limitations are not fully supported by objective medical evidence, the Seventh Circuit has instructed that if the claimant indicates that pain is a significant factor in her inability to work, the ALJ must obtain a claimant's description of her daily activities by asking specific questions about the pain and how it effects the claimant. *Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir. 1994) (citation omitted). The ALJ is required to investigate all avenues that relate to pain, which include a claimant's prior work record, information and observations by treating physicians, examining physicians, and third parties. And the ALJ must also consider the nature and intensity of a claimant's pain, precipitating and aggravating factors, dosage and effectiveness of any pain medications, other treatment for the relief of pain, functional restrictions, and the claimant's daily activities. *Id.*; *see also Villano*, 556 F.3d at 562.

23

While the ALJ obtained a detailed description of Gholston's daily activities at the hearing, she never discussed why she found her activities inconsistent with her allegations of disabling pain and limitations. At the hearing, for example, Gholston testified that on a typical day she needs assistance from her niece to take a shower, get dressed, make breakfast, grocery shop, and do laundry. (Id. at 47-49, 50-51, 55-56.) The ALJ did not explain why she found Gholston's testimony about her dependence on others to perform daily activities inconsistent with her claims of disabling pain. *See e.g., Zurawski*, 245 F.3d at 887 ("The ALJ should have explained the 'inconsistencies' between [the claimant's] activities of daily living (that were punctured with rest), his complaints of pain, and the medical evidence"). The ALJ's lack of analysis is of particular concern because the state agency physicians found that the medical evidence substantiated Gholston's reported daily activities. (Id. at 388, 437.) Accordingly, the ALJ's failure to explain why she believed Gholston could perform sedentary work in light of her limited daily activities constitutes reversible error. *See e.g., Villano*, 556 F.3d at 563 (the ALJ's conclusion that the claimant could perform a full range of sedentary work because she was able to do limited daily activities does not contradict a claim of disabling pain).

Finally, the ALJ's errors are compounded by her recitation of the consistently criticized boilerplate statement that she rejected Gholston's description of her symptoms "to the extent they are inconsistent with the above [RFC] assessment." (A.R. 25.) *See Shauger v. Astrue*, — F.3d —, 2012 WL 992100, at *4 (7th Cir. March 22, 2012) ("Credibility

findings must have support in the record, and hackneyed language seen universally in ALJ decisions adds nothing."). As the Seventh Circuit has made clear, finding statements that support the RFC credible and disregarding statements that do not "turns the credibility determination process on its head." *Brindisi,* 315 F.3d at 787-88. Here, the assessment of Gholston's ability to work necessarily hinges in large part on the credibility of her descriptions of the severity of her symptoms, and so the ALJ was required to factor her credibility into his assessment of the RFC, not use the RFC to determine her credibility. *See Bjornson v. Astrue*, 671 F.3d 640, 644-45 (7th Cir. 2012) (criticizing meaningless credibility template as unhelpful and explaining that it backwardly "implies that the ability to work is determined first and is then used to determine the claimant's credibility"). Given the ALJ's failure to properly analyze Gholston's testimony regarding her pain symptoms and daily activities, this court cannot be sure that she evaluated her credibility independently rather than dismissing her testimony to the extent it did not fit neatly within her RFC assessment. Based on all of these shortcomings, this court cannot uphold the ALJ's credibility determination.[5]

---

[5] To the extent the Commissioner defends the ALJ's analysis of Gholston's credibility with respect to her hand-joint pain, this court agrees that this portion of her discussion is supported in the record. But that shred of substantiated analysis—unconnected to any condition on which Gholston's disability claim rests—is insufficient to resolve the remainder of the unsubstantiated analysis of Gholston's credibility with respect to her chief complaints.

25

## C.     RFC

Gholston contends that the ALJ ignored pertinent portions of the medical evidence when she determined that Gholston could perform sedentary work.  (R. 15, Pl.'s Mem. at 9-13, R. 21, Pl's Reply at 7-10.)  Specifically, she claims that the RFC finding fails to properly assess her migraine headaches, her need to elevate her legs due to ankle swelling, her inability to stand for more than 15 to 20 minutes at a time, and her sitting limitations.  (Id.)  In response, the Commissioner asserts that the ALJ recognized Gholston's allegations of ankle pain and swelling, and migraine headaches, but that she appropriately found that she retained the ability to perform sedentary work.  (R. 20, Def.'s Mem. at 7-8.)  Thus, according to the Commissioner, the ALJ reasonably rejected Gholston's alleged inability to sit for extended periods of time and her need to elevate her legs because those complaints are not supported by the medical evidence.  (Id.)

The ALJ erred in assessing Gholston's RFC because she either mischaracterized relevant evidence or failed to address relevant evidence when she determined that Gholston could meet the requirements of sedentary work.  "The RFC is an assessment of what work-related activities the claimant can perform despite her limitations." *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004); *see also* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  In evaluating a claimant's RFC, an ALJ is expected to take into consideration all of the relevant evidence, including both medical and non-medical evidence.   *See* 20 C.F.R.

§§ 404.1545(a)(3), 416.945(a)(3).  According to SSA regulations, the ALJ must do more than

simply list or acknowledge the relevant evidence as instructed here:

> The RFC assessment must include a narrative discussion describing how the
> evidence supports each conclusion, citing specific medical facts (e.g.,
> laboratory findings) and nonmedical evidence (e.g., daily activities,
> observations).  In assessing RFC, the adjudicator must discuss the individual's
> ability to perform sustained work activities in an ordinary work setting on a
> regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an
> equivalent work schedule), and describe the maximum amount of each work-
> related activity the individual can perform based on the evidence available in
> the case record.  The adjudicator must also explain how any material
> inconsistencies or ambiguities in the evidence in the case record were
> considered and resolved.

SSR 96-8p, 1996 WL 374184, at *7.

In this case, the ALJ determined that Gholston has the RFC to perform the full range

of sedentary work.  (A.R. 25.)  In making this determination, the ALJ first mischaracterized

Gholston's testimony regarding her migraine headaches; she found that because her

headaches had improved with Imitrex and because she had previously worked for many years

without taking medication, that she had the ability to perform full-time work.  But, as

discussed  Gholston did not testify that she worked without taking medication.  Moreover,

though she testified that Imitrex eased her headaches, this improvement does not necessarily

equate with an ability to work on a full-time basis.  *See Scott*, 647 F.3d at 739.  Because

Gholston testified that she experiences at least one severe headache per month that lasts as

long as two weeks and requires her to take Imitrex and lie down until the pain eases, the ALJ

should have made a finding regarding the impact of her headaches on her ability to sustain

full-time work. *See Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004) ("Notably absent from the ALJ's order is a discussion of how [the claimant's] headaches and blurred vision affected her ability to work.").

Next, in crafting his RFC assessment, the ALJ did not properly consider Gholston's need to elevate her legs to alleviate her ankle swelling. The Commissioner defends the ALJ's decision by relying on Gholston's ankle x-rays, which showed no acute abnormality and only minimal degenerative changes, and her testimony that she could stand for 15 to 20 minutes at a time, which is sufficient to sustain sedentary work. (R. 20, Def.'s Mem. at 7.) But the Commissioner's defense of this aspect of the ALJ's decision relies on precluded post-hoc rationalizations because the ALJ never articulated these reasons in her analysis. *See Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003) ("[G]eneral principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ."). Because there is support in the medical record for Gholston's painful knee and ankle swelling, as well as a recommendation that she elevate her legs to reduce the swelling, (A.R. 503), the ALJ erred by not analyzing these conditions when formulating Gholston's RFC.

Nor did the ALJ explain why Gholston could perform sedentary work despite her inability to stand for more than 15 to 20 minutes at a time. Sedentary work requires the ability to stand or walk for up to two hours in an eight-hour workday. The applicable regulations state: "Although a sedentary job is defined as one which involves sitting, a certain

amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. §§ 404.1567(a), 416.967(a). The regulations further define occasionally as:

> [O]ccurring from very little up to one-third of the time. Since being on one's feet is required 'occasionally' at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday.

SSR 83-10, 1983 WL 31251, at *5. The ALJ's lack of analysis here precludes meaningful judicial review and is therefore reversible error. *See Clifford*, 227 F.3d at 870-71.

Furthermore, Gholston complains that the ALJ failed to address her limited ability to sit for extended periods. But here Gholston has substantiated her allegation with only two citations to the record supporting her alleged sitting difficulties. (*See* A.R. 251, 277.) While Gholston's argument is notably weak, because the court is remanding the case for other RFC errors, the ALJ should also assess whether Gholston is limited in her ability to sit for extended periods of time, which would preclude her ability to perform sedentary work.

Finally, the ALJ must "consider the combined effect of all of [the claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity." 20 C.F.R. §§ 404.1523, 416.923. The ALJ is required to undertake this analysis because the combination of a claimant's impairments "might well be totally disabling" even if each of the claimant's impairments standing alone is not serious.

29

*Martinez v. Astrue*, 630 F.3d 693, 698 (7th Cir. 2011). The ALJ's cursory analysis does not give this court confidence that she gave appropriate consideration to the combined effects of Gholston's impairments, including her obesity. The ALJ's failure to consider the full impact of Gholston's severe and non-severe impairments is another reason why this case must be remanded for further proceedings. *See Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009); *see also Villano*, 556 F.3d at 563 (remanded in part where the ALJ failed to analyze the combined effects of the claimant's obesity and her impairments).

**D.    Closed Period of Disability**

As an alternative argument, Gholston contends that the ALJ failed to consider whether she was entitled to a closed period of disability due to her breast cancer. (R. 15, Pl.'s Mem. at 13-14.) She asserts that she was unable to work from the time of her initial breast cancer diagnosis in 2005 through the time her cancer recurred in 2007, because she underwent a number of surgical procedures and related treatment that would have precluded her from working for more than a 12-month period. (Id.) In response, the Commissioner contends that Gholston has failed to produce evidence that she would have missed work and that her absences would have caused her to be disabled. (R. 20, Def.'s Mem. at 8-9.) The Commissioner further asserts that Gholston has failed to cite to any authority that requires an ALJ to consider whether a claimant is entitled to a closed period of disability. (Id. at 9.)

The Social Security Administration's definition of disability sets forth a requirement that a claimant be unable to engage in any substantial gainful activity ("SGA") as a result of

an impairment(s) that has lasted or can be expected to last for at least twelve months. *See* 42 U.S.C. § 423(d)(1)(A), 20 C.F.R. §§ 404.1509, 416.909. However, "the possibility that ability to engage in SGA may be restored despite the impairment(s) (e.g., through rehabilitation) does not preclude a finding of 'disability.'" SSR 82-52, 1982 WL 31376, at *4. Accordingly, even if a claimant expects to make a full recovery, she may still meet the durational requirement if she remains disabled during a period of treatment and recovery. *Id*.

The ALJ did not conduct an analysis of whether Gholston was entitled to a closed period of disability benefits during the time she was first diagnosed with cancer and underwent periodic cancer treatments beginning in 2005. Because the court is remanding this case for other errors, the ALJ should also assess whether Gholston is entitled to a closed period of disability to the extent she finds that the issue has not been waived. In conducting this analysis, if the issue is not waived, the ALJ should determine if Gholston was unable to work for a 12-month continuous period in light of her breast cancer surgery, treatment, and related recovery periods. The ALJ should give due consideration to Newman's testimony that the jobs he identified that Gholston can perform would accommodate no more than 1.5 days of absenteeism per month, which may render Gholston disabled for this period. (A.R. 58-59.) *See e.g., Janezich v. Barnhart*, 453 F.Supp.2d 1019, 1029 (N.D. Ill. 2006) (substantial evidence did not support a finding that the claimant who underwent reconstructive surgeries following breast cancer surgery, which required periods of recovery,

31

could perform sedentary jobs during that period, even though she was able to work for short periods of time between surgeries where two vocational experts testified that no employer would hire her because she had multiple surgeries and her periods of recovery required extensive absences).

## Conclusion

For the foregoing reasons, Gholston's motion for summary judgment is granted insofar as it requests a remand and the Commissioner's motion for summary judgment is denied.

**ENTER:**

Young B. Kim
United States Magistrate Judge